UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| G&S METAL CONSULTANTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09-CV-493 JD |
| | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This case arises from an insurance dispute. On November 29, 2007, an explosion

occurred at the Manchester, Georgia plant of G&S Metal Consultants, Inc. (GSMC), an

aluminum processing and recycling business. At that time, GSMC had a commercial insurance

policy issued by Continental Casualty Company (Continental). GSMC believes that Continental

has not fulfilled its obligations under that policy. So, it filed this lawsuit, alleging breach of

contract, promissory estoppel and tortious breach of the insurer's duty of good faith. [DE 5-2].

On September 18, 2015, the Court granted partial summary judgment for Continental as to

GSMC's promissory estoppel claim and breach of contract claim under the building and personal

property section of the policy. It further struck the parties' other filings as unduly lengthy and

confusing, and permitted each party to refile a single motion for summary judgment. [DE 286].

Continental has now filed a renewed, consolidated motion, arguing it is entitled to summary

judgment on GSMC's remaining claims: breach of the insurer's duty of good faith and breach of

contract under the business income and extra expense section of the policy. [DE 287]. The

parties have briefed Continental's motion and it is ripe for review. [DE 288, 292, 295].

## STANDARD OF REVIEW

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (internal quotation marks omitted). Since the Court is evaluating a motion for summary judgment filed by the Defendant, it will construe all disputed facts in the light most favorable to the Plaintiff. *See Anderson*, 477 U.S. at 255 (at the summary judgment stage "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

## FACTS

GSMC is an aluminum processing and recycling business. It was founded in 1995 in Wabash, Indiana and opened a second plant in Manchester, Georgia in 2007. The Manchester plant used four furnaces to melt aluminum: two gas and two electric. On November 29, 2007 water entered one of those furnaces, resulting in an explosion that caused several injuries, a fatality and extensive property damage.

At the time of the explosion, GSMC had commercial insurance coverage through the Defendant, Continental. GSMC's policy (# C 2074910019) (the Policy) contained two separate coverage forms. One coverage form provided building and personal property coverage (the BPP Form), the other provided business income and extra expense coverage (the BIEE Form).

Four days after the explosion, representatives from Continental toured the Manchester facility to evaluate the damage.  GSMC then began repair efforts, removing debris from the facility and retaining contractor Rufus Jackson Construction to perform triage repairs to the building's roof and walls.  After eight days, GSMC had resumed limited operations.  While the gas furnaces and one of the electric furnaces were restored to operation following the explosion, the other electric furnace remained offline.  Limited operations ended in April 2008, when GSMC's Scott Galley ordered the facility to close.  The parties do not agree as to why.  GSMC contends Galley observed a leaking roof and closed the facility for safety reasons.  Continental says that the closure was motivated by financial problems that predated the explosion.

Since the repairs performed by Rufus Jackson turned out to be inadequate, GSMC made efforts to locate another contractor to complete repairs to the facility.  Galley contacted some potential candidates (the exact number is not clear) and also reached out to Continental and the City of Manchester for recommendations.  He was not successful.  Ultimately, GSMC did not retain a contractor to complete repairs until nearly a year after the explosion, when its claims representative (Ellen Chanoch of MJ Insurance) located Langford Construction (Langford) in October 2008.  Langford then made repairs to the building, beginning with a scope of work meeting on October 29, 2008 and ending on March 16, 2009.  Over GSMC's objections, Continental determined that this reflected GSMC's "period of restoration" under the BIEE Form and accordingly compensated GSMC for five months of lost business income.

Even after the October 2008 – March 2009 repairs, the facility's roof leaked precipitously due to the inadequacy of the initial repairs performed by Rufus Jackson.  Langford accordingly recommended additional repairs to the roof, though Continental did not promptly fund them.  GSMC then declared bankruptcy in June 2009 and its assets were liquidated in a bankruptcy sale

in September 2009.  In October 2009, GSMC learned that Continental had internally authorized the funding of additional repairs (it is not clear when that authorization occurred), but had not provided those funds to Langford or GSMC.  Ultimately, Continental not did pay GSMC for the additional roof repairs recommended by Langford until December 2009, after the bankruptcy sale and GSMC had filed suit.

While this litigation began in July 2009 in bankruptcy court, it has since come to this court via a withdrawal of reference.  It has now lasted for more than seven years, proceeding through extensive discovery and one partial motion for summary judgment, in which the Court granted judgment for Continental on GSMC's claims for promissory estoppel and breach of contract under the BPP Form.  That leaves GSMC's claims for breach of the insurer's duty of good faith and breach of contract under the BIEE Form remaining.  Continental now asserts that it is entitled to summary judgment on those claims for several reasons.  First, it contends that GSMC's claim for breach of the BIEE Form is barred by GSMC's failure to comply with appraisal and fraud provisions in the Policy.  Second, it argues that GSMC has no claim for breach of the BIEE Form since: (1) Continental appropriately paid GSMC for lost business income based on a five-month period of restoration and (2) GSMC's claims that Continental owes it additional lost business income due to "melt loss"—i.e. productivity lost due to reliance on inefficient gas furnaces during GSMC's temporary operation period from December 2007 to April 2008—and a projected increase in business are unfounded.  Finally, it says there is no evidence it acted in bad faith.  The Court addresses each argument in turn.

# ANALYSIS

## The Appraisal Provision

Continental first says GSMC's breach of contract claim is foreclosed by the BIEE Form's appraisal provision. That permits either party to demand an appraisal and requires payment only after an appraisal award or the parties agree on a loss amount. [DE 289-9 at 31, 33]. Since neither of those things have happened, Continental reasons that it cannot yet have breached the BIEE Form. GSMC responds that the appraisal provision is only intended to govern the timing of payment, not to limit Continental's duty to pay. Further, it says that even if the appraisal provision is a condition precedent to payment, Continental has now waived any right to appraisal it may have had.[1]

The appraisal provision in the BIEE Form is more than a mere "timing provision." Rather, it invokes the conditional "if" to indicate that payment will not occur until an appraisal happens or the parties agree as to loss amount:

> We will pay for covered loss within 30 days after we receive the sworn proof of loss, *if* you have complied with all of the terms of this Coverage Part and: a. We have reached an agreement with you on the amount of loss; or b. An appraisal award has been made

[DE 289-9 at 33] (emphasis added). GSMC argues to the contrary, relying on *Montalvo v. American Family Mutual Insurance Company.* No. CV-12-02297, 2014 WL 2986678, at *1, 8 (D. Ariz. July 2, 2014). But that case involved a policy that provided payment would be due thirty days after agreement, arbitration or entry of a final judgment, not *if* those events occurred. More importantly, courts in this circuit have found language more permissive than that in the BIEE Form to constitute a condition precedent to payment. *Ocwen Loan Servicing, LLC v.*

---

[1] While the Court previously ruled that Continental did not have an obligation to pay under the BPP Form sooner than it did, that is not determinative of this issue. The Court's previous finding was confined to the timeliness of payment. The Court did not address whether the appraisal provision was an absolute condition precedent to payment, since the parties agreed that Continental ultimately paid everything it owed under the BPP Form.

*Nationwide Mut. Fire Ins. Co.*, No. 1:07-CV-01449, 2012 WL 1067854, at *13 (S.D. Ind. Mar. 29, 2012) (condition precedent to payment where the policy stated "Payment will be made within 60 days after we receive your proof of loss and: (1) reach agreement with you; or (2) there is an entry of a final judgment; or (3) there is a filing of an appraisal award with us."); *see also Philadelphia Indem. Ins. Co. v. WE Pebble Point*, 44 F. Supp. 3d 813, 821 (S.D. Ind. 2014) (condition precedent to suit where policy provided that either party had the right to demand an appraisal with binding results, though permitted the insurer to deny the claim notwithstanding the appraisal results).[2]  Accordingly, the Court finds compliance with the appraisal provision to be a condition precedent to payment.

But like any other contract right, the right to appraisal may be waived.  *Integrity Ins. Co. v. Lindsey*, 444 N.E.2d 345, 347 (Ind. Ct. App. 1983) ("The right to appraisal, as well as the notice of waiver requirement, are similar to arbitration rights in that they are all contract rights. As such, they, like any other contract right, may be waived, amended or altered."); *see also Philadelphia Indem. Ins. Co.*, 44 F. Supp. 3d at 821 n. 5 ("Indiana's arbitration statutes do *not* mandate that arbitration clauses be invariably construed as conditions precedent to suit . . . parties remain free to waive them").  Where, as here, "the policy does not state a specified time within which demand for appraisal must be invoked, demand for appraisal must be made within a reasonable time under the circumstances of the case[.]"  *Monroe Guar. Ins. Co. v. Backstage, Inc.*, 537 N.E.2d 528, 529 (Ind. Ct. App. 1989); *see also Terra Indus., Inc. v. Commonwealth Ins.*

---

[2] In *Hayes v. Allstate Insurance Company*, the Seventh Circuit found that an appraisal clause is not a condition precedent to suit unless it explicitly says so.  722 F.2d 1332, 1335 (7th Cir. 1983).  That case has since been widely distinguished as inconsistent with current Indiana precedent.  *See, e.g., Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 202 (2d Cir. 2012).  Further, the policy in *Hayes* provided for judicial determination of loss, which the Policy here does not.  *Hayes*, 722 F.2d at 1335 n. 5; *see also Philadelphia Indem. Ins. Co.*, 44 F. Supp. 3d at 820 n. 3.

*Co. of Am.*, 981 F. Supp. 581, 599 (N.D. Iowa 1997) (collecting cases). Further, waiver requires finding that good-faith negotiations as to loss amount have ceased and that prejudice resulted from the delay in demanding appraisal. *Id*.

In this case, these criteria are handily met. After seven years of litigation and discovery, there is no plausible argument that Continental's invocation of the appraisal provision comes within a reasonable period of time. Further, the prejudice to GSMC, were the Court to scrap nearly a decade of legal work to commence appraisal proceedings, would be immense. As such, the Court finds the appraisal provision in the BIEE Form to be waived. *See Advanced Radiant Sys., Inc. v. Peerless Indem. Ins. Co.*, No. 1:14-CV-1943, 2016 WL 1117759, at *10 (S.D. Ind. Mar. 22, 2016) (finding waiver where a party waited almost a year after commencing litigation to request appraisal); *Southland Lloyds Ins. Co. v. Cantu*, 399 S.W.3d 558, 577-78 (Tex. App. 2011) (finding waiver where insureds invoked appraisal in a letter to their insurer, but the insurer did not respond to that letter, the insured then filed suit and the insurer did not raise appraisal until sixteen months into litigation); *Summit Towers Condo. Ass'n, Inc. v. QBE Ins. Corp.*, No. 11-60601-CIV, 2012 WL 1288735 (S.D. Fla. Apr. 4, 2012) (finding it hard "to imagine a situation where a party acts more inconsistently with the right to seek an appraisal" than where a plaintiff "actively and vigorously" litigates a case, incurring more than $1m in legal fees); *Cypress Pointe at Lake Orlando Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, No. 6:10-CV-1459, 2012 WL 6138993, at *2 (M.D. Fla. 2012) ("A party that fails to seek appraisal within a reasonable time after the commencement of litigation waives its appraisal right by acting inconsistently with that right.").

Continental's arguments to the contrary do not change this result. It first cites *Travelers Property Casualty Company of America v. Marion T, LLC,* No 1:10-CV-1384, 2010 WL

1936165 (S.D. Ind. May 12, 2010) and *Ocwen*, 2012 WL 1067854, at *13. Its reliance on those

cases is misplaced. *Travelers* found that an appraisal provision foreclosed a dispute as to the

timeliness of payment where the parties ultimately submitted to an appraisal process, following

which the insurer promptly paid what it owed. *Travelers*, 2010 WL 1936165, at *5. *Ocwen*

involved a policy that provided for payment after agreement, appraisal or—unlike this case—"an

entry of a final judgment." The court there granted summary judgment for the insurer, finding

that no precondition to payment had been met, in part because judgment had not yet been entered

in an ongoing parallel state suit. *Ocwen*, 2012 WL 1067854, at *13. Thus, *Ocwen* and *Travelers*

do not implicate waiver, and indeed there is no indication that the parties to those cases ever

raised it.

      Continental also argues that waiver is inapplicable, since under the BIEE Form waiver is

a condition precedent to *payment*, not a condition precedent to suit. And, it says, it contests only

its obligation to pay, not the Court's jurisdiction over this suit. But there is little practical

difference between these positions. For, even if Continental does not expressly seek to stay or

dismiss this litigation in favor of appraisal, a ruling precluding judgment absent an appraisal

would effectively require GSMC to seek the same result. Moreover, courts have inquired into

whether a party invoked appraisal within a reasonable period of time even where the appraisal

provision formed a condition precedent to payment. *See SR Int'l Bus. Ins. Co. v. World Trade

Ctr. Properties LLC*, No. 01 CIV. 9291, 2003 WL 1344882, at *1-2 (S.D.N.Y. Mar. 18, 2003)

(noting that "the obligation of the insurers to pay the loss arises only if the Company has reached

an agreement with the insured on the amount of the loss or an appraisal award has been made"

but then proceeding to the question of whether "the demand for an appraisal was made within a

reasonable time") (internal quotation marks and alteration omitted). This is consistent with

Indiana precedent, which generally treats appraisal provisions, like all other contract rights, as waivable. *Integrity Ins. Co.*, 444 N.E.2d at 347; *see also Harrison v. Thomas*, 761 N.E.2d 816, 820 (Ind. 2002) (noting that "it has long been the law in this state" that a condition precedent to another party's contractual performance "may be waived in many ways") (quoting *Johnson v. Bucklen*, 36 N.E. 176, 177 (Ind. Ct. App. 1894)). As such, the Court finds no basis to conclude that the appraisal provision cannot be waived merely because Continental asserts it is a condition precedent to payment rather than to suit and finds that Continental has waived the appraisal provision in the BIEE Form.

The Fraud Provision

As its second affirmative defense, Continental argues that the Policy is void because GSMC breached the fraud condition in it. That provision provides:

> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, Intentionally conceal or misrepresent a material fact concerning:
>
> 1. This Coverage Part;
>
> 2. The Covered Property;
>
> 3. Your Interest in the Covered Property; or
>
> 4. A claim under this Coverage Part

[DE 289-9 at 80]. Continental asserts GSMC committed fraud sufficient to void the Policy in three ways: (1) knowingly submitting an inflated estimate for repairs to the Manchester facility, (2) representing that it shut down that facility in April 2008 due to a roof leak rather than financial problems in a bid to extend the period of restoration for which lost business income is payable and (3) submitting a knowingly false "melt loss" claim based on a doctored spreadsheet.

Even assuming that these fraudulent acts occurred, the Court agrees with GSMC that Continental has failed to present evidence that they were material. The Indiana Supreme Court has laid out two tests for materiality: "Under one definition, a misrepresentation or omission is

'material' if knowledge of the truth would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk . . . A second approach to materiality in a case . . . where rescission is attempted after a loss has been incurred, would measure the materiality not against the underwriting decision, but rather against the loss.  In other words, coverage of the incurred loss would be voided if the misrepresentation affected that risk, but not all coverage would necessarily be voided." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 672-73 (Ind. 1997). An Indiana Court of Appeals case, *Insuremax Insurance Company v. Bice*, interpreted these tests in the context of alleged fraud in a claims investigation process.  879 N.E.2d 1187, 1191 (Ind. Ct. App. 2008).  It found that neither of them were directly applicable, though noted that they both "focus on whether the misrepresentation had a significant impact on the insurer's decision-making process." *Id*.  Applying that inquiry, *Insuremax* then declined to void an insurance policy on summary judgment, since the insurer had not presented evidence that the insured's misrepresentations caused the insurer to take a substantially different position in responding to its potential liability.  *Id* at 1191-92.

A federal court later adopted this approach in another case involving alleged fraud by the insured in claim processing, *Acuity v. Auto Tech Automotive Inc.*, No. 2:09-CV-336, 2012 WL 124928 (N.D. Ind. Jan. 17, 2012).  There, the insured lied to the insurer (before later recanting) about items that were destroyed in a structural fire.  The insurer argued on summary judgment that the insured's misrepresentations voided the policy under a fraud clause.  The court denied summary judgment finding, among other things, that "this case, like *InsureMax*, lacks evidence from the insurer regarding the effects that the misrepresentations had on decisions to investigate and/or defend against the claim." *Id*. at *7.

Like these two cases, Continental fails to provide evidence that GSMC's purported

misrepresentations had "a significant impact on the insurer's decision-making process." *Insuremax*, 879 N.E.2d at 1191. It argues only that GSMC's alleged fraud "relates to the loss and is intended to affect the insured's claim for coverage under the policy." [DE 295 at 14 n. 9]. But as *InsureMax* and *Acuity* illustrate, that does not satisfy Indiana's materiality requirement. Regardless of what the insured intended, materiality requires that fraud affect the insurer's handling of the claim. And Continental does not argue that GSMC's alleged fraud had any impact on the claims process. Some of the evidence it designates does show that Continental spent some time evaluating the purportedly fraudulent claims submitted by GSMC. *See, e.g.*, [DE 289-19 at 20-22], [DE 289-11 at 34-35]. But there is no indication that Continental changed its coverage position in response to them, or that Continental's evaluations were any more expensive or time consuming than those that would ordinarily be conducted by an insurer following a major industrial accident. Lacking any other evidence of materiality, Continental falls well short of establishing that a reasonable finder of fact would be compelled to conclude that GSMC's purported misrepresentations were material. It is thus inappropriate to find the Policy void on summary judgment. *See Insuremax*, 879 N.E.2d at 1191 ("the materiality of the representation or omission is a question of fact to be resolved by the factfinder unless the evidence is such that there can be no reasonable difference of opinion") (quoting *Guzorek*, 690 N.E.2d at 673).

Moreover, even if the Court concluded that the alleged fraud was material, this issue would still not be suitable for resolution on summary judgment. As to the $1.7m estimate, Continental provides evidence that this figure may have been inflated. For example, Langford Construction and Rufus Jackson provided markedly lower quotes for repairs to the building. [DE 289-8 at 3]; [DE 289-20 at 4]. Continental also submits the deposition of Michael Fusco, a

GSMC claims representative, who indicated that he arrived at an estimate of approximately $841,100. [DE 289-10 at 22]. GSMC then requested that he take a different "conceptual approach" to the estimate. *Id.* In response, Fusco produced a significantly higher estimate that, among other things, characterized work that had been done previously as temporary and accounted for the cost of replacing it. [DE 289-10 at 21-29]. He advised that this would provide GSMC leverage in negotiating with Continental. [DE 289-5 at 4]. According to Continental's engineer, this estimate incorporated unnecessary work and was "inflated, unreasonable, and flawed in many respects." [DE at 289-19 at 20]. Rufus Jackson likewise testified that this estimate was "grossly inflated," exceeded the cost of replacing the entire building and that he thus refused to submit an estimate in conformance with it. [DE 289-20 at 3-4]. Finally, GSMC's Ken Rauch acknowledged that the $1.7m quote "included work that had been completed and needed pared back off of the quote," [DE 289-21], though did so in May, 2008, several months after the $1.7m quote was submitted in February 2008. [DE 289-10 at 44]. While this all suggests that GSMC's $1.7m quote was high, it does not indisputably indicate that GSMC acted with fraudulent intent when it submitted its claim. At best, it is an amalgam of circumstantial evidence that might suggest the same, and thus is the province of a jury to evaluate.

Continental next says that GSMC lied in representing that it shut down the Manchester facility due to a roof leak, when it really shut it down due to financial issues. It provides substantial evidence in support of that position. *See, e.g.*, [DE 289-25] (April 18, 2008 GSMC email indicating that "shutting down Manchester sounds like it may make sense, especially if it will quickly reduce our cash expenses for payroll and utilities"); [DE 289-27] (April 25, 2008 GSMC email including a worksheet compiled "for considering whether we shut down Manchester for a period of time"). But GSMC presents evidence that water was "pouring" into

the facility at that time. [DE 293-2 at 26-27]; *see also* [DE 293-6 at 10, 14]. Further, Scott Galley testified that this influenced his decision to close the facility. [DE 293-1 at 4] ("During a visit on April 28, 2008, I saw rainwater leak from the roof in the vicinity of a furnace . . . Refusing to risk another explosion or the death or injury of any more employees, I made the decision to close the Manchester plant until it could be properly repaired"). Thus, the evidence points to multiple potential motivations for closing the Manchester facility. That precludes a finding on summary judgment that GSMC did not close the facility due to a roof leak, and that it thus acted fraudulently in representing that it did.

Finally, Continental asserts that GSMC fraudulently manipulated a spreadsheet to conceal that it did not experience a melt loss (i.e. a financial loss resulting from reliance on less efficient gas furnaces after GSMC's more efficient electric furnaces were damaged in the explosion). In support of this argument, it points to two spreadsheets, one that does not contain melt loss recoveries, and one that purportedly does. [DE 289-32, 289-33]. It does not, however, provide any clear evidence indicating that GSMC intentionally, as opposed to accidentally, omitted this information. That alone is sufficient to deny summary judgment. But, Continental also does not respond to GSMC's argument that the purportedly excluded information represents formulaic anticipated melt loss recoveries, rather than actual recoveries. GSMC further says that this information was accessible in the native format version of the first spreadsheet produced.[3] If believed, that would provide further basis for a reasonable juror to conclude that GSMC did not act fraudulently in submitting its melt loss claim.

---

[3] Surprisingly, these arguments are submitted merely as narratives from counsel and are not supported with admissible evidence. Nevertheless, they merit some consideration to the extent that GSMC or counsel may be able to substantiate them through testimony at trial. *See Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form.") (emphasis in original).

Thus, the Court finds that summary judgment on Continental's fraud defense is not warranted for two reasons. First, a reasonable juror could conclude that the misrepresentations alleged by Continental do not amount to fraud. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (noting that summary judgment on an affirmative defense is only appropriate where no reasonable trier of fact could find other than for the moving party). Second, Continental has not presented evidence that the misrepresentations it identifies are material, which is necessary to void the Policy. *See Insuremax*, 879 N.E.2d at 1191-92. As such, and consistent with the Indiana Supreme Court's directive that "summary judgment is almost never appropriate where the claim requires a showing that the defendant acted with criminal intent or fraudulent intent," the Court denies summary judgment on Continental's fraud defense. *Klinker v. First Merchants Bank, N.A.*, 964 N.E.2d 190, 195 (Ind. 2012).

Breach of the BIEE Form

Having rejected Continental's affirmative defenses, the Court turns to considering Continental's argument that summary judgment is appropriate because GSMC has failed to present the evidence necessary to substantiate its case. It argues that the undisputed facts show that it did not breach its obligations under the BIEE Form. GSMC responds that a reasonable finder of fact could conclude that Continental breached the BIEE Form in three ways: (1) in paying GSMC based on a five month period of restoration when the actual business interruption period is longer, (2) in failing to adequately compensate GSMC for its "melt loss" and (3) in underpaying GSMC for lost business income by failing to account for the new customers GSMC was projected to obtain. The Court addresses these arguments sequentially.

*Period of Restoration*

First, GSMC says that Continental improperly calculated the period of restoration.[4]  As is relevant to this dispute, the BIEE Form provides that the period of restoration runs from the date of damage to "the date when the property should be repaired, rebuilt or replaced with reasonable speed and similar quality[.]"  [DE 289-9 at 36].  That extends no longer than the time by which an insured acting "as quickly as possible" would have completed repairs to its property.  [DE 289-9 at 33].  This is a theoretical calculation reflecting "the length of time required with the exercise of due diligence and dispatch to rebuild, repair or replace the damaged premises.  Where the actual restoration period exceeds the theoretical period or where the premises are not restored, the theoretical period becomes the computation period."  *Steel Products Co. v. Millers Nat. Ins. Co.*, 209 N.W.2d 32, 38 (Iowa 1973); *see also Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 398 (2d Cir. 2005)*; SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, No. 01 CIV. 9291, 2005 WL 827074, at *3-4 (S.D.N.Y. Feb. 15, 2005) (collecting cases).

In this case, Continental says the period of restoration is, at most, five months.  It bases this on the October 29, 2008 – March 16, 2009 period during which Langford Construction settled on a scope of work with GSMC and made repairs to the facility.  GSMC responds that the five month period is inaccurate because it does not account for the time GSMC required to locate a suitable contractor from November 2007 to October 2008.  Further, GSMC says that the facility was not restored to its prior state by the Langford repairs ending in March 2009, since it

---

[4] GSMC misrepresents a prior ruling in this case to argue that the Court has already concluded that "factual concerns" regarding the applicable period of restoration preclude summary judgment.  [DE 292 at 14].  The Court's prior order, however, merely dismissed motions for summary judgment filed several years ago as premature.  While the Court noted that the period of restoration "raised factual concerns," it did not substantively analyze the evidence presented by the parties.  [DE 157 at 9].

remained unusable after that due to a leaky roof.[5]

The Court turns first to the theoretical time required by an insured in GSMC's position to find a contractor using reasonable diligence. Continental does not dispute that the period of restoration incorporates this. [DE 295 at 7 n. 5]. That makes sense. Business interruption insurance "must continue for at least the reasonable time necessary to end the interruption" which may include "more than just 'rebuilding, repairing, or replacing' the relevant real property." *Duane Reade*, 411 F.3d at 392 n. 2 (alterations omitted). Finding a contractor, while not part of physical repairs, is an essential part of the rebuilding process.

But Continental claims that GSMC did not act with reasonable diligence and thus took longer than it should have to find somebody to do repairs. That might be true, though GSMC has still offered evidence that the time required to locate a contractor may extend the period of restoration beyond the five months for which Continental compensated GSMC. That does not require an especially formidable showing, since Continental's five-month period does not include *any* time to locate a contractor.[6] Rather, it starts when "GSMC first contacted Langford Construction Company in October 2008." [DE 288 at 13]. Thus, the inquiry becomes whether it could have taken an insured acting "as quickly as possible" any significant period of time to locate a suitable contractor. GSMC has provided evidence that would permit a reasonable juror to find that to be so. Scott Galley contacted contractors and the City of Manchester for

---

[5] Since neither party makes any argument as to what impact, if any, the repairs Rufus Jackson made to the facility should have on the period of restoration, the Court does not address them.

[6] While a scope of work meeting occurred on October 29, 2008, Continental does not indicate when GSMC first contacted Langford. In theory (if not probability), GSMC could have contacted Langford on the day of the scope of the work meeting, October 29, 2008. That would leave GSMC sixteen days between October 13, 2008 (the start of the five-month period advanced by Continental) and October 29, 2008 to find a contractor within the five months for which Continental compensated GSMC. But even if that were true, based on the evidence presented, a reasonable juror could conclude that it would have taken more than sixteen days for an insured acting as quickly as possible to retain a contractor.

assistance in locating a contractor, but was unable to secure bids. [DE 293-1 at 3]. GSMC also reached out to Continental for assistance in locating a contractor to no avail. [DE 293-5 at 4]; [DE 293-2 at 18-19].[7] That GSMC took these steps and was unable to immediately locate a contractor could persuade a reasonable juror that locating a contractor could have taken some appreciable period of time beyond the five months construction took once GSMC located Langford. This is not to say that GSMC necessarily acted as quickly as possible to resume its operations. Indeed, Continental has presented evidence that supports a shorter restoration period than that advocated by GSMC, such as the forbearance agreements between GSMC and Fifth Third Bank that may have interfered with restoration. [DE 289-7]. But since Continental did not pay GSMC for *any* lost business income for the period GSMC attempted to locate a contractor— which the evidence suggests may not have been feasible immediately—the exact period of time a diligent insured in GSMC's shoes would have taken to locate a contractor will be a question for the jury.

GSMC also contends that the period of restoration should be extended beyond March 2009 because Continental did not fund repairs to the building's roof, and thus restore the building to its prior condition, until December 2009. Continental acknowledges that the period of restoration may be extended by "delay attributable to [the insurer's] failure to perform its duties under the policy." [DE 288]. But, it says that it did not breach any timing of payment provision in the Policy, and thus its actions cannot have extended the period of restoration.

---

[7] An insured contacting its insurer is one reasonable means of attempting to locate a contractor. While GSMC continues to emphasize that Continental was in a better position to find a contractor, that is all but irrelevant. As this Court concluded in its prior order, Continental had no obligation to assist GSMC. What matters here is the diligence exercised by the insured and the period of time it would have taken a diligent insured to locate a contractor. GSMC's efforts to reach out to Continental are simply one indication of efforts GSMC took to locate a contractor.

The absence of a technical breach does not, however, foreclose the possibility that Continental's actions may have extended the period of restoration. The inquiry is how long it would have taken GSMC to resume operations had it acted "as quickly as possible." [DE 289-9 at 33]. If Continental delayed payment, even if not in breach of the Policy, that logically could have extended the period of time it would have taken GSMC to resume operations. *See United Land Inv'rs, Inc. v. N. Ins. Co. of Am.*, 476 So. 2d 432, 438 (La. Ct. App. 1985) (finding that, even though the insurer made an advance payment and recognized its obligation to pay under the policy, the insured was "in no position" to make repairs until the insurer and insured had arrived at the total amount to be paid).

While Continental argues that the period of restoration is extended only by an insurer's "failure to perform its duties under the policy," [DE 288 at 15] (citing *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 787 F.2d 349, 353 (8th Cir. 1986)), the cases look to whether the insurer caused a delay in the insured's repairs, rather than the insurer's technical compliance with policy provisions. *Hampton Foods*, 787 F.2d at 355 ("We agree with the position taken by the district court in [*Omaha Paper Stock*] where the court used the standard of a theoretical period of restoration but allowed a reasonable extension of that period where restoration delay was due to actions of the insurance company."); *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 445 F. Supp. 179 (D. Neb. 1978) (examining delays in restoration caused by the insured and the insurer, and extending the period of restoration to account for delay caused by matters within the province of the insurer); *Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*, No. 02 CIV. 8123, 2003 WL 22004888, at *7 (S.D.N.Y. Aug. 25, 2003) (describing the inquiry as "whether defendant's delay in payment caused a delay in plaintiff's ability to reestablish its operations"); *Meadowcrest Living Ctr. L.L.C. v. Hanover Ins. Co.*, No. CIV. A. 06-3210, 2008 WL 2959707, at *2 (E.D. La.

July 30, 2008) (noting that the delay of an insurer's adjuster in approving repairs could support a longer period of restoration). Consistent with these cases, the period of restoration can be extended by a delay in payment by the insurer, even if that delay does not technically breach the insurer's obligations under the policy. This comports with the simple proposition that business interruption insurance ought to "put[] the insured into the monetary position it would have been in but for the interruption of its business." *Omaha Paper Stock Co. v. Harbor Ins. Co.*, 596 F.2d 283, 288 (8th Cir. 1979). If an insurer drags its feet in assisting the insured, regardless of whether it technically breaches the policy, that can slow restoration and increase the insured's losses.

Applying these principals, a reasonable juror could conclude that the period of restoration should be extended beyond March 2009. GSMC has presented evidence that as of March 18, 2009, the Manchester facility had not been restored to its prior condition as the roof was leaking precipitously.[8] [DE 293-6 at 10, 14]; [DE 293-2 at 27]. Continental argues that this is inconsequential, since GSMC has not presented evidence that Continental's failure to fund repairs prevented GSMC from proceeding with them. But it is reasonable to presume that an insured requires assistance from the insurer before it is able to make repairs. *See United Land Inv'rs, Inc.*, 476 So. 2d at 438. That is particularly true here, where Continental had funded previous repairs. [DE 293-6 at 7]. Further, the defense repeatedly emphasizes GSMC's financial frailty at this point in time. *See, e.g.,* [DE 288 at 18]. And even if GSMC was in a position to move forward with repairs immediately, Langford testified that the roof repairs would

[8] Continental says that GSMC "signed off on a punch list indicating that repairs were complete," citing lines 41:11 – 42:16 of Langford's deposition. [DE 289 at 5]. But in that deposition excerpt, Langford only generally testifies as to what punch lists are, and explains that from his review of a deposition exhibit (which is not included in the record) he believes that all repairs agreed upon in the initial estimate were completed by March 17. [DE 289-8 at 8-9].

have taken about thirty days from authorization to complete. [DE 293-6 at 11-12]. Funding aside, that could make extension of the period of restoration by one month appropriate.

Continental also says that "GSMC has not shown how the need for any addition [sic] roof repairs resulted in any additional 'lost business income[.]'" [DE 295 at 9 n. 8]. But Langford testified that, following the October 2008 – March 2009 repairs, the roof at the facility "was leaking dramatically, actually in the area over the furnace or the smelting device . . . where the explosion occurred." [DE 293-6 at 10]. So, it is reasonable to conclude that the facility was not restored to its prior condition or able to resume operations at this time. That would extend the period of restoration and thus add to the lost business income calculation (though, as discussed below, the appropriate measure of lost business income is disputed and will be a question for the jury).

Continental next says that "by the time [the roof repair] issue first arose GSMC had already filed for bankruptcy and sold its assets." [DE 295 at 9 n. 8]. But that isn't true. While Langford's first round of construction finished on March 16, 2009, GSMC did not file for bankruptcy until June 24, 2009. Moreover, regardless of the bankruptcy, GSMC is entitled to its lost profits for the entire period of restoration. That could be curtailed if bankruptcy would have occurred even if the explosion had not happened. The Court cannot, however, resolve the inevitability of bankruptcy on summary judgment given the evidence GSMC has provided of the financial harm the Manchester explosion inflicted on its financial condition. *See, e.g.*, [DE 289-3 at 13] (describing the financial problems GSMC encountered in 2007, including the Manchester explosion); [DE 289-2 at 11] (noting the adverse impact Continental's handling of the Manchester claim had on GSMC's operations).

So, the Court finds that summary judgment as to the period of restoration is not warranted. GSMC has presented evidence that an insured acting "as quickly as possible" would not have been able to repair the damaged facility within five months due to the time required to locate a contractor and adequately repair the building's roof. The applicable period of restoration will thus be a question for the jury. *See Quality Molding Co. v. Am. Nat. Fire Ins. Co.*, 272 F.2d 779, 781 (7th Cir. 1959) (noting that issues as to the applicable period of restoration were "clearly questions for the jury"); *Gus Meat Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, No. 91 C 0345, 1992 WL 107313, at *3 (N.D. Ill. May 14, 1992) ("The issue of when 'normal operation' resumed, and thus the 'restoration period' ended, is a question for the finder of fact's consideration and determination."); *Streamline Capital, L.L.C.*, 2003 WL 22004888, at *7 n. 6 (finding that "whether defendant's delay in payment caused a delay in plaintiff's ability to reestablish its operations is a jury question"); *W. Am., Inc. v. Aetna Cas. & Sur. Co.*, 915 F.2d 1181, 1184 (8th Cir. 1990) (affirming jury's determination as to the applicable period of restoration); 11 Couch on Ins. § 167:18 ("What constitutes a reasonable period to carry out the necessary repairs and resume business is a question for the jury").[9]

*Melt Loss*

The Court turns next to GSMC's "melt loss" claim. Recall that GSMC processes scrap aluminum using both gas and electric furnaces. GSMC says that the Manchester explosion damaged its electric furnaces, forcing it to rely on less efficient gas furnaces, which reduced its yields and profitability. It asserts that this is lost business income, and that Continental breached

---

[9] Continental cites *Meridian Ins. v. Cha Cha, Inc.*, 868 N.E.2d 922 (Ind. Ct. App. 2007) for the proposition that the applicable period of restoration is a question of law. But that case is unpublished and has not once been cited for any proposition. Further, it addressed a dispute between the parties as to allocation of decision-making between a court and an appraiser, not between a court and a factfinder.

the BIEE Form by refusing to compensate it accordingly. Continental responds that GSMC has not presented any evidence that it actually sustained a melt loss.

Analysis of this claim is complicated by the parties' imprecise treatment of the evidence. Both parties cite to lengthy documents without specifically identifying relevant sections of them or providing meaningful analysis. *See, e.g.*, [DE 289 at 19] (inviting the Court to compare a sixty-three page spreadsheet and an eight-page spreadsheet for the proposition that GSMC intentionally misrepresented its melt loss claim); *id.* (citing a forty-six page business report to demonstrate that GSMC's use of the gas reverb furnace was no greater after the loss than during the month proceeding the loss); [DE 292 at 20] (citing to three paragraphs in the statement of genuine disputes and two exhibits for the general proposition that "following the explosion, GSMC was forced to use inefficient processes to melt the aluminum which resulted in a decrease in aluminum recovery"). This is surprising given that the Court's last order in this case expressly articulated the importance of providing *specific* citations to the record. *G & S Metal Consultants, Inc. v. Cont'l Cas. Co.*, No. 3:09-CV-493, 2015 WL 5554201, at *5 (N.D. Ind. Sept. 18, 2015).

A review of the parties' submissions, however, reveals that there are genuine disputes of material fact as to GSMC's melt loss claim. Continental provides significant evidence that no melt loss occurred. This includes the contested spreadsheet discussed above which purportedly shows GSMC's metallic yields, [DE 289-33], and the testimony of Continental's accountant, who testified that GSMC's electric furnaces were more efficient than its gas furnaces but concluded that he "could not demonstrate a melt loss in [GSMC's] financial records." [DE 289-11 at 9]. Further, Continental cites the testimony of Al Dominguez, the Manchester plant manager, which GSMC does not contest. Dominguez indicated that in early 2008, following the

explosion, the single electric furnace GSMC had in operation was sufficient "to service all the material that [GSMC] otherwise wanted to melt by the induction method."  [DE 289-28 at 8].

But GSMC has presented opposing evidence.  First, it submits testimony from its forensic accountant describing a melt loss claim at a GSMC facility in Wabash, Indiana.  [DE 289-12 at 13].  That may establish that melt loss is a potentially compensable loss, though does not speak directly to whether a melt loss occurred at the Manchester, Georgia facility at issue here.  More pertinently, it presents a spreadsheet and accompanying email in which GSMC's Dave Roll explains that melt loss is tough to calculate, but can be surmised by examining declines in physical inventory at the Manchester facility as compared to the quantity of raw material GSMC took in and shipped out following the explosion.  [DE 289-32].  Mr. Roll then explains that "Manchester experienced an inventory gain during 2007, but significant losses in 2008."  *Id*. at 2. While perhaps not as concrete as the evidence offered by Continental, a reasonable juror could nevertheless credit this testimony and accordingly find that GSMC's inventory levels dropped following the explosion, reflecting a melt loss.  It is not the Court's role to weigh this evidence and summary judgment for Continental on this aspect of GSMC's claim is thus inappropriate.

*New Customers*

Finally, GSMC contends that Continental has not adequately compensated it because Continental's payments did not account for the new business that GSMC was projected to receive during the period of restoration.  Continental responds that any income not realized from alleged lost customers is not compensable under the Policy and that GSMC's evidence as to its new accounts is too speculative to support its claim.

Continental relies on *Coupled Products, LLC v. Harleysville Insurance Company* for the proposition that "lost business income must result from 'the necessary suspension of [GSMC's]

operations,' not from alleged lost customers." [DE 295 at 10-11] (citing No. 1:09-CV-00349 JD, 2011 WL 3101357, at *2 (N.D. Ind. July 25, 2011)). But *Coupled Products* is readily distinguishable. That case involved a question as to whether the insured had suffered a business interruption following the theft of its products by a competitor. The court found that it had not since undisputed facts established that the plaintiff's "usual business operations continued unabated after the theft." *Id*. at *6. It further noted that a business interruption requires an inability to meet customer demand, rather than a mere reduction in customer demand. *Id*.

Here, by contrast, the parties do not dispute that GSMC suffered a business interruption—i.e. the explosion at the Manchester plant—and that GSMC was then unable to meet customer demand for a period of time. Under the plain text of the BIEE Form, any projected increase in GSMC's profits is relevant to assessing the resulting loss GSMC incurred. [DE 289-9 at 32] ("The amount of Business Income loss will be based on . . . the likely net income of the business if no physical loss or damage had occurred[.]").[10] That is consistent with the rule that business loss expenses "are to be determined in a practical way, having regard to the experience of the business before the catastrophe *and its probable experience thereafter*." 12 Couch on Ins. § 185:3 (emphasis added); *see also Ebert v. Grain Dealers Mut. Ins. Co.*, 303 N.E.2d 693, 697 (Ind. Ct. App. 1973) (Business interruption insurance is "designed to do for the insured what the business itself would have done had no interruption occurred."); *In re Cosmetics Plus Grp., Ltd.*, 379 B.R. 464, 473 (Bankr. S.D.N.Y. 2007) (finding that lost business income encompassed projected revenues from the insured's planned going out of business sale, less compensation the insured received for the inventory that would have been sold in that sale).

---

[10] The Policy excludes from consideration "any Net Income that would likely have been earned as a result of an increase in the volume of the business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses[.]" [DE 289-9 at 32]. Here, however, GSMC contends that the new business at issue was anticipated far before the explosion, not triggered by it.

As such, to the extent GSMC can establish new accounts would have increased its profits from historical levels, that is a proper component of the lost business income calculation.

Even so, Continental says that the evidence GSMC has presented that it was slated to obtain new business before the explosion is too speculative to survive summary judgment. This consists of a general summary of anticipated new accounts that GSMC provided to Fifth Third Bank as part of a credit request. [DE 289-3 at 10]. While brief, this document contains business names, expected sale quantities and dates. Further, Pat Bowden, who did sales work for GSMC, testified that GSMC did land new business from the Accuride and Alcoa Davenport accounts listed in that summary. [DE 293-10 at 10-11]. While not as concrete as it could be, this evidence does point to a triable issue of fact. *See Polytech, Inc. v. Affiliated FM Ins. Co.*, 21 F.3d 271, 276-77 & n.2 (8th Cir. 1994) (affirming determination that evidence of lost profits was sufficient to merit a trial where the plaintiff did not submit expert testimony from its accountants to the district court, though "presented substantial evidence on changes in its business operation and practices that it says would have resulted in future profitability"). GSMC will, however, be required at trial to substantiate its request for lost profits with sufficient testimony to allow for a finding based on "a reasonable degree of certainty and exactness." *Indianapolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009).

The Court does note that Continental has presented considerable evidence of GSMC's financial problems. *See, e.g.*, [DE 289-3 at 8-9] (describing lost business, a substantial inventory write-down and associated losses GSMC experienced in 2007); [DE 289-2 at 25] (describing the numerous financial challenges GSMC faced in 2007). Continental argues these were unrelated to the explosion and thus should factor into the business income calculation, offsetting any profits GSMC would have reaped from new business. While that is a reasonable point, this

simply amounts to conflicting evidence. Since it is the jury's job to parse conflicting evidence, not the Court's, summary judgment is inappropriate here.

Bad Faith

That leaves GSMC's bad faith claim. GSMC contends that Continental's "continued reliance on a five-month period of restoration based on a final completion date of March 16, 2009 is an act of bad faith." [DE 292 at 22]. It says that, as of October 2009, Continental had approved payment of funds to Langford that had not yet been paid. [DE 293-6 at 15-16]. In December 2009, Continental then paid GSMC $229,988.24, including $189,547.21 for roof repairs by Langford. [DE 289-14]. Since Continental paid for these repairs, which are not encompassed by the October 2008 – March 2009 repairs and would have occurred after them, GSMC argues that Continental must know that the five-month period it advances is inadequate.

This theory of bad faith is both entirely different from that alleged in GSMC's complaint and unsupportable. In its complaint, GSMC contended that Continental acted in bad faith by delaying the investigation and payment of GSMC's claim. The Court rejected this argument in so far as it may have been a basis for finding that Continental breached a contractual duty of good faith to GSMC under the BPP Form. [DE 286 at 5-8]. GSMC's pivot to now arguing bad faith in regards to Continental's position on the period of restoration is not a viable tactic for three reasons. First, a plaintiff cannot raise a new theory with no factual basis in the complaint in response to a motion for summary judgment. *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion."). Second, the period of restoration is a nuanced factual inquiry, Continental's position as to which is not susceptible to a finding of bad faith. *See Irving Materials, Inc. v. Ohio Cas. Ins. Co.*, No. 1:03-CV-361, 2008 WL 687126, at *2 (S.D.

Ind. Mar. 10, 2008) (finding no bad faith where insured's position as to a disputed legal issue was not patently true or false and the insured's position as to it was not determinative since the issue was "entrusted to the court for resolution"). GSMC has reasonable arguments for extending the period of restoration beyond five months. But, in light of the factual complexity of this case, Continental's election to peg the period of restoration to the only substantial period of time during which repairs to the facility were actually performed is not so flagrantly unreasonable as to give rise to a finding of bad faith. Further, while GSMC points to the additional funds Continental ultimately paid, those at most show that Continental knew further repairs to the building were necessary, not that they were necessary to resume operations such that they would extend the period of restoration. Finally, while GSMC asserts that its bad faith claim is based on Continental's "continued reliance on a five-month period of restoration," [DE 292 at 22], that argument is foreclosed by Indiana law to the extent it refers to Continental's present litigation posture. Conduct that occurs after the filing of a bad faith claim, or in the case of a claim denial after the insurer's denial of the claim, is irrelevant to evaluating a bad faith claim. *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 42 (Ind. Ct. App. 1999). Here, regardless of whether GSMC describes Continental's position as a "claim denial" or otherwise, years have passed since Continental rejected GSMC's business interruption coverage demands and GSMC filed its bad faith claim. That precludes Continental's current conduct from giving rise to a bad faith claim. For all of these reasons, summary judgment is appropriate as to GSMC's bad faith claim.

## CONCLUSION

Continental's motion for summary judgment [DE 287] is **GRANTED IN PART** as to GSMC's bad faith claim. Summary judgment is **DENIED** as to GSMC's claim for breach of the

BIEE Form.  Since the Court resolves this motion without oral argument, GSMC's motion as to

the same [DE 294] is **DENIED as moot**.

SO ORDERED.

ENTERED:  August 2, 2016

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court